Good afternoon ladies and gentlemen, this is the time for argument in Hemp Industries Association v. DEA. We understand all those who intend to present argument are present, so we'll hear the case. Mr. Sandler, you may proceed. Thank you, Your Honor. Good afternoon and may it please the Court. I represent the petitioners in this case who are challenging the Drug Enforcement Administration's final rule, Rule 205F, banning hemp, stock, fiber, seed and oil, all of which had been legal for many years under the express statutory exemption for hemp in the Controlled Substances Act. The only effect of DEA's new final rule, 205F, is to add a hemp, stock, fiber, seed and oil to the Controlled Substances Act to bring them under control for the first time. And the key issue in this case is whether these substances were already covered by the Controlled Substances Act prior to DEA's promulgation of this new final rule. Because if they were not, the statute is clear that DEA has added to a CSA schedule, Controlled Substances Act schedule, substances that were not previously on any schedule. And the statute is clear that in order to do that, DEA must undertake a formal rulemaking, rulemaking on the record after opportunity for hearing, notice and comment rulemaking not being sufficient under the statute, and the DEA must make certain specified findings with respect to these new substances in order to put them on the applicable schedule. We submit, of course, that hemp, stock, fiber, seed and oil were not covered by the Controlled Substances Act prior to DEA's new rule because the statute is plain on its face that hemp, stock, fiber, seed and oil are excluded from the definition of marijuana set forth in Section 802.16 of Title 21. Now DEA argues, DEA's argument basically is that hemp, fiber, stock, seed and oil are nonetheless covered under the separate listing in Schedule 1 of the CSA for THC, tetrahydrocannabinol, the active drug ingredient in marijuana, because of the trace infinitesimal amounts of THC naturally occurring in these hemp plant parts. I mean, the statute is quite specific on that point that any substance containing THC is covered, no matter how little. That's true, Your Honor, but in fact the way the statute is structured, all forms of naturally occurring THC known to exist in the world are already covered as marijuana except for the very substances that are explicitly excluded from the definition of marijuana, hemp, stock, fiber, seed and oil. So let's say somewhere in the Amazon they find a new plant that's not hemp, that's not marijuana, but that has THC in it. It is your position that the DEA could not prohibit use of the drug in commerce, of the plant in commerce, without actually amending the schedule going through on the record for rulemaking? That is exactly right, Your Honor. Were that case to ever occur. That's a little strange, isn't it? Excuse me? That's a little strange. Is it not when the statute specifically says any substance containing THC, I believe it says, help me with the language here, no matter in what quantity, right? No matter how small. Exactly. It's not a question. They discover a completely new plant that has the stuff in it in copious quantities. People can use it until the DEA takes the time to go through, what, six months, a year, whatever, on the record rulemaking, right? In that situation, of course, the DEA could exercise its emergency interim scheduling authority, which would have to be used in this situation. We come to us and we then join it on the same argument. You would say, look, you can amend the schedule, and after you've amended the schedule, you can prohibit it, but you can't do an interim rule to cover something that's not in the schedules now. And you'd use exactly the same argument to say the only way you can accomplish this is by having a final rule. No, but if they exercise their scheduling authority.  Pardon? I don't think so, Your Honor, because if they exercise their scheduling authority, again, involving a formal rulemaking and the necessary findings and then adjacent or pursuant to that there's an interim emergency authority they can exercise, there wouldn't be such an argument. And the other key distinction is that the hypothetical or the new plant that you're hypothesizing is not something that Congress specifically on the face of the statute thought about and addressed almost 70 years ago. That's a better argument. That's a better argument for you to say that's a plausible interpretation of the statute, but as it happens, it conflicts with this other provision, which Congress already covered, so the specific comes in general. I think that's a better argument. Right. I mean, the way that. . . Not necessarily a winning argument, but better. Right. Well, our view, and that's just the point, Your Honor. Our view is that the statute as Congress. . . The Congress knew what they were doing, that the statute forms an integrated whole in which all forms of naturally occurring THC are known in the world. There is this hypothetical possibility of discovering something new, but currently known in the world are covered. They did not distinguish between naturally occurring THC and synthetic THC. They just said THC. Right, but the reason. . . Remind me, was there synthetic THC in 1937? I don't think it's a question of interpreting the term. . . I realize you might not think it's important, but just help me out historically. I don't believe there was synthetic THC in. . . And yet Congress did talk about substances containing THC, so they must have been referring to natural, no? No, I don't think so. Again, because if any THC that is naturally occurring in the non-exempted parts of marijuana, of course, is covered as marijuana, and any THC naturally occurring in these exempted parts to the extent that it is, you know, separated, extracted, concentrated, somehow exists in any other form, would be covered as a derivative of the resin, derivative of the resin from the hemp seed in oil, which is re-controlled, which is covered as marijuana. Well, I understand your argument, but just help me out. I'm serious, just so I understand the history of it. Congress passes the 37th statute. Was that the Controlled Substances Act? No, the Controlled Substances Act was not passed until 1970. The 1937 Act was the Marijuana Tax Act. And that's where the definition of marijuana comes from. Okay. And it contains a reference to THC. The Marijuana Tax Act? Yeah, did it? I don't believe so. Okay, so that's something that was brought in in 1970. Yes, exactly. So you've got the 1937 Act, which exempts, as you say, the stalks, the fibers, and seeds. That's right. And then in 1970, Congress adds this provision dealing with THC. That's right. And does not at that point, in 1970 it was clear that there was both natural occurring and synthetic THC. That's right. Congress does not say synthetic THC, it just says THC. That's right. But, again, we believe that it's not a question of interpretation or what they meant. It's a question that all naturally occurring forms of THC were already covered as marijuana. And so that's why it's just a logical corollary that since everything natural that exists in the world, leaving aside your hypothetical of a new plant discovered in the Amazon, is already covered as marijuana, it's only logical that the term THC refers only to synthetic THC. And this Court, in explaining that in the first case in dealing with the interpretive rule, Hemp Industries Association versus DEA, which the parties have been referring to as Hemp One, explained that in promulgating its existing regulation, limiting the definition of THC to synthetic THC, the DEA wasn't interpreting anything. They were simply giving, in the words of this Court, giving effect to the exemption for sterilized seeds under marijuana and recognized that the listing of THC in Schedule I did not cover the trace amounts of organic THC in the sterilized seeds. That being the only form of naturally occurring THC that isn't covered because it's specifically exempted by Congress. Let me ask you this. Isn't this exactly the kind of situation covered by Chevron? I mean... No, Your Honor, that... Congress gives opinions with broad strokes, and then it has this agency, which it funds, that develops expertise, and Chevron teaches us that details like that ought to be left to be resolved by the agency, and the agency here simply changed its mind. No, that's... The agency has minds. We don't... It changed its policy. We don't agree at all that that's what they've done, Your Honor. We believe it's not a question of interpreting the language at all, that the structure of the statute itself is clear on its face, leaves no room for ambiguity, and that what they're doing is adding something to the schedules that's not there. Let me ask you this. Put aside the provision dealing with marijuana. Let's just strike it from the statute for purposes of the discussion. Okay? Okay. This is hypothetical, but that's what we just do. Okay. So all the statute now contains is this other provision that says any substance containing THC, no matter how small or how miniscule an amount, you would agree, would you not, that under those circumstances, the agency could say THC is used in the statute, again, leaving out this other provision, could mean both synthetic and natural THC? If Congress had not spoken to that issue at all, and elsewhere in the very same statute, the very same schedule of the statute, of course we would agree with that. So you're agreeing that when they say THC, that standing alone is ambiguous, or at least is capable of interpretation. You could say it applies to... which has been the longstanding policy of the agency, or it could refer to all THC. Either interpretation would be plausible. Well, in hypothetical and theoretical isolation from the rest of the statute, as it's actually written, such an interpretation would be possible. And what precludes it is the express words of Congress and the structure of the statute taken as a whole, which doesn't raise any question of interpretation or ambiguity. We agree, Your Honor, I mean, there's no question that under the CSA, the DEA actually has delegated legislative authority to amend the statute, to add substances that aren't there already. But it's not surprisingly Congress has carefully circumscribed that extensive delegated legislative authority, by providing that when DEA does in effect amend the statute to add something that's not there, they have to follow the scheduling procedure involving a formal rulemaking and specified findings. And they've done that successfully. If you're in fact right, probably DEA couldn't add it, even if it went ahead and did on the record rulemaking, because according to your reading of the statute, Congress has specifically exempted this. And I would think that your theory would mean that if Congress has something specifically exempted from the schedule, the agency couldn't then come back and add it back in. It couldn't, for example, tomorrow, I would guess you would say, amend the schedule by saying we now do include stocks and seeds and fiber, because Congress has specific to the definition of marijuana. No, I think they could do that if the subject of the scheduling proceeding was actually hemp stock, fiber, seed, and oil, and they found that those substances, not extracting and concentrating, because that's already covered as marijuana, but that those parts of the plant in and of themselves had a potential for abuse and they consulted with HHS and went through the whole scheduling procedure, then they can add something that's not there. Even though according to your theory, Congress has specifically exempted it. Even by specifically exempting it, Congress left those, made clear that those are currently not on the schedule. It is always open to DEA to find that a substance, and through the scheduling procedure, find that a substance that Congress didn't think about, had no intention of including as a controlled substance, should now be added as a controlled substance. They've done this with new drugs that Congress never heard of, even in 1970, like ecstasy and some of these other dangerous new drugs, which they've successfully scheduled and added to the schedule. Your position is that if Congress said ecstasy shall not be in the schedule, the agency could then do a rulemaking and add it back in, even though Congress has said it. That would be somewhat different, but if they said such and such. It would not be different at all. If Congress had left, had thought about ecstasy, left it off, but DEA now said we think this substance is now capable of abuse, they can go through a scheduling procedure to add it. What they can't do. You see why it matters, because if you buy your argument, the full force of your argument, it seems to me that the agency couldn't add it, even if it does go through a rulemaking, because according to you, Congress has clearly exempted it. No, I think. I'm not sure how an agency can go about amending the statute to actually contravene an exemption Congress has created. If they found that those substances now present a potential, in and of themselves, again, not extracted, not processed, but in and of themselves pose a potential for abuse that Congress never thought of, they could undertake a scheduling proceeding for those substances. The exemption means it's not on there now, but they have authority. They have authority effectively to amend the statute, provided that they go through a scheduling proceeding. They want to cover natural substances that contain these very small trace elements of THC. Then they have to go through a separate rulemaking. That's exactly right, Your Honor. They have not. It's undisputed that they haven't done that in this case, and it's for that reason that their Rule 205F is invalid. And with the Court's permission, I'd like to reserve the balance of my time for rebuttal. Thank you. Thank you, Your Honor. Good afternoon, and may it please the Court. Daniel Dormont for the United States Department of Justice Drug Enforcement Administration. The rules at issue here, Your Honors, are the first rules ever issued under the Controlled Substances Act to specifically address the legal status of products made from the cannabis plant. In addressing this question, Your Honors, the Drug Enforcement Administration took into account all the relevant provisions of the Controlled Substances Act. Most notably, those provisions are the definition of marijuana, the listing of THC, tetrahydrocannabinols, in Schedule I, and an important point, the disallowance under the Act of human consumption of Schedule I controlled substances in any amount. They take into account the objections of people who might say that this doesn't make a lot of sense? I mean, you say they took everything into account, but they just went ahead and published a rule. Actually, we did, Your Honor, in this sense. Going through notice and comment, there were comments. The agency received many, many comments, and some were just along the lines of what you said. In fact, not even those nice words. And the agency understood this. And what the agency did, clearly it wasn't popular with everyone, but the agency attempted to strike a balance between the competing statutory provisions and what the agency felt were the appropriate policy decisions here. Well, what was the policy decision? The policy decision, Your Honor, was that the – first of all, the agency felt it had to give effect to what it believed was the appropriate reading of the statute. And in the first instance, that looks to tetrahydrocannabinols. Well, behind the wording, what possible policy does the DEA have for saying that these substances have any capacity for harm? Well, the concern of the Drug Enforcement Administration isn't particularized to the particular products that these petitioners make. DEA has never said, has never focused on these particular products and said anyone can get high from them or that they pose a harm to people. Now, at the same time, we certainly haven't said that with any degree of certainty we know that these are necessarily safe for people. But the point is, it's not focusing on these particular products. The question is, can you have a product intended for human consumption that contains a Schedule I hallucinogen? And DEA felt that what Congress did was appropriate to say that there are no de minimis amounts of Schedule I hallucinogens. Clearly, you can have any of the Schedule I hallucinogens in trace amounts that aren't going to harm anyone, but would that be appropriate to allow that, to make an allowance for that? So you take the position that the DEA could ban poppy seed bagels, right? No. The reason we, and we specifically addressed that, could we ban them? Yeah. I realize you haven't because you would get a lot of flack for that. Not just because of the flack. From other people. But let's say, what does the distinction mean? The distinction is in the statute itself, and it is a very important distinction. The wording of the statute is clearly different for poppy seeds than it is for cannabis seeds. I was asking you about policy. Yes. Now, tell me, what's the policy reason for distinguishing between poppy seeds and cannabis seeds? In addition to the point I mentioned to Judge Fletcher, the other important, very important consideration is this. If natural THC is not considered controlled, that is if the ruling is that it is only synthetic THC that is controlled. Well, marijuana is controlled. Yes. And that covers, that does indeed cover most of, just about everything we see in trafficking up to this point. However, there is an important loophole that would be created if the THC were limited to synthetic THC. Well, what is the loophole? As the agency stated in the text accompanying the rules, Judge Fletcher, the loophole is this. The, you can take any part, any plant material that contains any amount of THC, even in tiny amounts, and you can make an extract from that plant material. I think all the evidence is to the contrary. Respectfully, it would suggest it's not, and that's why the case that I provided to opposing counsel and to the clerk, United States v. Ticciarelli, indicates something very close. And I'll explain why it's not the same, but it's very close.  which was used, well, what the traffickers who grew it did was they harvested off the good parts of the plant, the stuff that's good for smoking, the buds and the leaves. And what they had left, the discarded part that nobody would want to smoke, even though that had very low THC content, that was still used to make a very potent extract known as hashish oil. And what the case reveals is that, indeed, it's not just a fantasy that that might occur. It indeed could be used. It's a scientific fact, Your Honor, that any natural source of THC can be used to make this potent extract. But the statute specifically speaks to that, because it has an exemption within the exemption. What it says is marijuana is banned, but seeds, stalks, and fiber are not, except resin extracted from them. So Congress, I mean, that's a difficult provision for you to get past, because it recognizes that Congress was aware that it wasn't under delusion that stalks on seeds don't contain any THC. They were aware that it did contain some. Nevertheless, they exempted it. But they were aware enough of the fact that these things could be distilled to dangerous level by saying, if you do extract the resin, then that's back under the definition of marijuana. And that shows quite a bit of congressional awareness of what they were doing. Well, actually, Your Honor, respectfully, they weren't that aware, and if I may explain why. Just like every other piece of legislation? There are other examples of that in the Controlled Substances Act. It's far from a perfect document. How do you deal with that? I mean, that has to do exactly with your case, where they cook the stuff. I don't know how they got the extract, but I assume it involves some form of cooking or chemical extraction process. And that gets us exactly to the point of back-covering the statute. They now got the resin that has the potent stuff in it, and that's covered. It is not, and this is an extremely important point that I'd very much like to emphasize to the Court. And that's one of the reasons why we cited the Ticciarelli case, because Your Honor's point is the point emphasized to a great degree in Petitioner's reply brief. That is not resin extracted from the plant. And what it boils down to is the distinction between hashish and hashish oil. Resin extracted from the plant is hashish. Hashish, as the Court may be aware, when the plant, in the flowering tops and in the leaves, there are glands in the plant that secrete the resin, and that comes to the surface of the plant. And when you make hashish or gather hashish, what you do is you scrape off the hashish, and that's been done for years, and you can press it into blocks. That is resin extracted from the plant. And the Ticciarelli case, I think, forgive the pun, hashes that out rather nicely. What Ticciarelli reveals is that hashish oil is something different. Hashish oil is an extract produced by chemical extract along the lines of what Judge Kaczynski just explained, but it is clearly not resin extracted from the plant. I'm sorry. I may be misremembering the statute. Maybe we can just look at the language. I thought the statute itself refers not to simply resin, but the resin extracted from stalks, seeds, and fiber. So Congress was aware that you could pull the resin off the flowering tops and make hashish. Yes, exactly. So it wasn't talking about that. Yes, it was. It was talking about the hashish. Well, how could it do that? I mean, otherwise it would have just said resin. Well, hashish is resin. Well, I'm sorry. Do you have the statute? Help me out here. Yes. The terminology, as the Ticciarelli court points out, is somewhat arbitrary. I'm sorry? The terminology, hashish, hashish oil, is somewhat arbitrary. But nonetheless, what is considered to be resin extracted from the plant, and there are several places in the Ticciarelli decision and in the decision by the Court of Appeals in the same case, which I also attached, which addressed this. Footnote two on page 78 of the Ticciarelli opinion. Okay. Indicates that hashish is variously defined as a drug formed from the resin scraped from the flowering tops of the cannabis plant. Yes, but so what? That's not what the statute says, is it? I mean, when the statute creates exemption within the exemption, it is talking about the resin extracted from the stalks, fiber, and seeds. Another, if I may. Am I confused about that? Not at all. Resin extracted from any part of the plant is controlled as marijuana. You're absolutely correct about that. Okay, I'm sorry. I have the statute here. It's 21 U.S.C. 80216, right? Yes. Such term does not include the mature stalks of such plants, fiber product from such stalks, or cake made from seeds of such plants, any other compound, manufacture, salt derivative, and so on, except the resin extracted therefrom. Yes. I thought that therefrom includes stalks, fiber, and seeds. Yes, you're absolutely right. And in the first sentence, it in fact includes resin extracted from any part of the plant. So there's no part of the plant, if you got resin from any part of the plant. No, I'm sorry. I'm going to have to go over this one more time. Okay. You were saying the resin is hashish. Yes. It's the stuff that if you go out, I'm taking your words for it. I have no idea. Okay. But I'm assuming that what you're telling me is correct. You go out there, you find a plant. It has leaves. It has a flowering top. And then you tell me it has some resin that can be scraped off the plant. Yes. Okay. That stuff is marijuana. Yes. The leaves are. The resin is. Yes. The stuff that you don't have to squeeze out, that just all you have to do is scrape it off. Right. And the flowering tops. Yes. Then the statute says, but when you've gotten rid of all those things, you still have stalks, fiber, and seeds. And those things are not marijuana. Are we together on that? Sterilized seeds, yes. Yes. Sterilized seeds. Yes. Okay. Right? Yes. Then it says, but if you have resin extracted therefrom. Yes. Which must mean the resin extracted from those three things. It cannot be referring to the resin that you just scrape off when the plant is in the wild, because that's already covered by the first sentence. But it does, Your Honor, in this sense. The resin, while it is secreted in the flowering tops and in the leaves, because those are the parts of the plant that have the glands from which the resin is secreted, the resin can also adhere to, and it does indeed adhere to, the seeds, the stalks, and any other part that comes into contact with the buds or the leaves. Fine. No problem with that, but it has to. The resin in the second sentence in the parenthetical cannot be the resin that you can just scrape off, because that's already covered in the first sentence. It must mean something that you get when you take the seeds, the stalks and the fiber, and somehow get resins associated with that. Yes. Yes, that's true. Telling us about scraping things off in the wild doesn't really help. So it must be that this resin, the one in the parenthetical, involves something that's somehow gotten, like chemical process or by cooking or something? They use the word extracted. Yes, that's right. Not scraped off. Well, extracted is, again, that's why I refer to the court to Ticciarelli, because I think that is, of the cases we've seen, best describes what we're talking about. Let me tell you what this tells me, and I'm going to try to say it once before. What this tells me is Congress knew full well that stalks and seeds and fiber could be carriers of some level of tetrahydrocannabinol. It was aware of that. Nevertheless, it says unless you do the extracting part, they are not marijuana under the definition. That's what it says to me. And hasn't the agency, in fact, nullified this sentence in the statute by modifying the definition of THC to cover exactly what Congress exempted? No, because, and this is where I've failed to be clear enough for the court thus far. You were perhaps clear but not persuasive. Important difference. The resin, when I refer to scraping it off, it can be scraped off from any part of the plant. That's how resin hashes it. They talk about extract. They talked about extract, right? I mean, surely extract means something else than scrape, and they've already covered the stuff you scrape in a previous sentence. If I may, perhaps it will help if I add this additional fact. The THC found in stalks, found in oil from the seeds, and found in the seeds is not simply from the resin. The THC is actually, if you cleaned the resin completely from the stalks, from the seeds, as petitioners say they attempt to do. That's why their products, they say, have extremely low THC content, because they do a thorough cleaning job, and they remove, to the full extent possible, the resin. It's been determined, and both the government and the petitioners have cited the studies, as recently as 2000 and 2001, they're cited in both the briefs, where not only the resin, but also the stalks, the actual cleaned stalks and seeds, have THC in them. In other words, any part of the plant, of the cannabis plant, has THC in it, and it sells. But that's not a new fact. That's obviously a fact Congress must have known, or else it would not have needed to have the parenthetical. If Congress naively thought that you could not get any THC, whatever the hallucinogenic substance is, you couldn't get it from the seeds, the stalks, and the fiber, they wouldn't have needed the parenthetical. The parenthetical refers solely to the resin, meaning that the recognition that Congress had that those parts of the plant, the stalks, did indeed have resin on the surface from contact with the more potent parts of the plant. But Congress, I think it's fairly safe to say, did not know what we know now. In fact, the leading experts in the country just released the studies in 2000 and 2001 to specifically look at the question of whether the seeds cleaned of the resin still have THC, and they reached the conclusion that they did. Counsel, why is the government so resistant to a scheduling procedure? The government believes that it's just not consistent with the structure of the Act. It's not consistent with even putting aside really which is our primary response to that question, that the government believes it's already scheduled as tetrahydrocannabinols. The government believes that the way the schedules are set up, particularly for Schedule I hallucinogens, any material compound or mixture that contains any amount of a substance is scheduled under the listing of that substance. Therefore, it would be inconsistent with the structure of the Act to do a separate scheduling based on parts of the plant that already have that substance in them. That wouldn't be consistent with that. In addition to that, for THC, the determination has already been made that it meets the criteria for placement in Schedule I, at least for synthetic THC. Everyone agrees that synthetic THC is in Schedule I and it meets the criteria. Well, scientifically speaking, there's absolutely no distinction between synthetic and natural THC as a molecule, and therefore there would be no scientific point in going forward with a scheduling action for natural THC. It is exactly the same thing. If you isolated it, no one would be able to tell where it came from, natural or synthetic. Well, we have the definition of marijuana, and then we have THC, and historically everybody thought it meant synthetic THC. And I'm sure many people in the agency thought it was synthetic, and I'm sure there was a big battle within the agency as to what you should do if you wanted to add this. And it seems that the government is a bit disingenuous not to do a scheduling action if they want to add in these things which are excluded. Well, respectfully, while Your Honor accurately points out that there was historical practice to treat the THC from the non-marijuana parts of the plant as non-controlled, at least for practical purposes, that's absolutely correct. Once these new products came on the market, consistent with Supreme Court precedent, the agency is permitted to adapt its reading of the statute in the manner it best sees fit to deal with the new circumstances as long as it's acting within the range of permissible interpretations. Before you sit down, can you tell me how you are going to save the bagel? How we're going to, I'm sorry? Save the bagel. You started to tell me about the language of the statute, and Judge Fletcher then asked you to get back to policy. I'm less interested in policy than I am in the language of the statute. So just very quickly, tell me what would prevent the agency from outlawing the poppy seed bagels tomorrow? Because it does not say in the statute that anything that contains any amount of morphine, thebane, and codeine, those are the controlled substances you could actually find and trace amounts in poppy seeds. It does not say in the statute that anything that contains any amount of those is controlled, which is what it says for Schedule I hallucinogens. What it says is that the substances must be extracted from substances of vegetable origin. So if someone took poppy seeds and put them in an extraction process by chemical extraction, extracted out the morphine, thebane, and codeine, that would be controlled, but poppy seeds in their natural state are not. Okay. Thank you. Thank you, Your Honor. Mr. Court, thank you. With respect to the analogy of poppy seeds, which we do believe is highly instructive, the statute does define the term narcotic drug to mean opium, opiates, and so forth, and then any compound mixture of preparation which contains any quantity of the substances referred to, meaning opium or opiates. Notwithstanding that and the fact that that definition clearly uncovers both natural and synthetic opium, the fact that the definition of opium poppy, the plant, in Section 802.19 excludes the seed, takes the seed out of control, and the DEA has never contended otherwise. With respect to the Cicciarelli case, again, this dealt with the sentencing guidelines, the district court's decision was overruled by the First Circuit, which observed that it's clear in page 13, the case you've just been handed, it's clear that whether or not the substance at issue is hashish oil, it certainly qualifies as marijuana under the code. And then citing the definition of marijuana, it's not disputed that the substance at issue falls within this broad catch-all definition of marijuana. Likewise, the hypothetical extract concentrated natural THC from, again, scientifically or economically feasible from hemp stalks, seed, and oil, would likewise be covered as marijuana within this broad catch-all definition. So this would be under what, under the parenthetical? Yes, under the parenthetical. Now, opposing counsel tells me that the resin has a very specific meaning. It means the stuff that's on the outside of the plant. And just cooking the stalks and fibers may get you some THC substance, but that's not resin. No, we disagree with that, Your Honor, because in 1937, as Your Honor pointed out earlier, THC was unknown as such, and the term resin was clearly used by Congress, and the legislative history is just replete with this, to mean what they understood to be the active drug ingredient. They didn't use the term THC because it hadn't been discovered yet. Resin meant not just what we think of as resin as counsel has characterized it, but the broader meaning of the active drug principle. So we don't agree that it has used in 1937, and thus in the parenthetical to which Your Honor referred, that it just meant resin. But it was reenacted in 1970 when they didn't know. That's right. Reenacted without charge. They may not have taken a close look at the language, but at least formally speaking, they passed the statute again, and at that point they did know the difference. Yes, at that point they did know the difference. I guess your argument would be that they didn't take a close look at the language. Right. We believe that it's still retained, really, and there wasn't any indication that they intended to change the meaning that it had been given in the 1937 Act. And then finally, because the DEA concedes that they have had the historical practice of treating hemp seed as being non-controlled, we believe, we submit that the reason for that practice is because, in fact, it has been non-controlled, it was not controlled, and that's precisely why they need to undertake a scheduling action just if they want to control it at this point. Thank you very much. Thank you, counsel. The case is argued and submitted for decision. And that concludes the court's ballot. The court stands adjourned.
judges: Schroeder, B Fletcher, Kozinski